Susan Aline SPELLISSY, individually and as one qualified to be Personal Representative of the Estate of Michael J. Spellissy, deceased, et al.; Carol Joan Balog, individually and as one qualified to be Personal Representative of the Estate of Robert William Balog, deceased, et al.; Joseph Bialowicz, individually and as one qualified to be Personal Representative of the Estate of Mark Bialowicz, et al.; Hope Gibson, individually and as one qualified to be Personal Representative of the Estate of Richard Gibson, deceased, et al.; Suellen Sebring, individually and as one qualified to be Personal Representative of the Estate of Larry Thomas Sebring, deceased, et al.; Nicholas J. Caltagirone, individually and as one qualified to be Personal Representative of the Estate of Ronald J. Caltagirone, deceased, et al.; Christine Ann Keck, individually and as one qualified to be Personal Representative of the Estate of Timothy Norman Keck, deceased, et al; Marie Koch, individually and as one qualified to be Personal Representative of the Estate of Edward Koch, deceased, et al.; Kikuie McCord, individually and as one qualified to be Personal Representative of the Estate of Collie McCord, deceased, et al.; Virginia Beach, individually and as one qualified to be Personal Representative of the Estate of Edward J. Beach, deceased, et al.; Melissa V. Kelly, Lenora A. Barnett, individually and as one qualified to be Personal Representative of the Estate of Larry Dean Barnett, et al.; Maira Rita O Campos, individually and as one qualified to be Personal Representative of the Estate of Liberto Campos, deceased, et al.; Brenda McConkey, individually and as Personal Representative of the Estate of Robert F. McConkey, III, et al., Plaintiffs-Appellants,

v.

UNITED TECHNOLOGIES CORPORATION, et al., Defendants-Appellees.

No. 86–3260.

United States Court of Appeals, Eleventh Circuit.

Aug. 3, 1987.

Joel D. Eaton, Joel S. Perwin, Podhurst, Orsek, Parks, Josefsberg, Eaton, Meadow & Olin, P.A., Miami, Fla., for plaintiffs-appellants.

Robert S. Cooper, Jr., Port Haywood, Va., for Barnett.

Robert B. White, Rapp, White, Janssen & German, Philadelphia, Pa., for McConkey, et al.

Kathleen M. O'Connor, Thornton, David & Murray, Miami, Fla., for General Dynamics Corp.

Robert F. Spohrer, Norwood S. Wilner, Zisser, Robison, Spohrer, Wilner & Harris, P.A., Jacksonville, Fla., Ralph S. LaMontagne, Jr., Kern & Wooley, Los Angeles, Cal., for Aviall, Inc.

Before KRAVITCH and EDMONDSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This is an appeal by an injured passenger and by next-of-kin or the personal representatives of persons killed in the crash of a Navy airplane in the St. John's River near Jacksonville, Florida from a verdict in favor of the defendant, Aviall, which had repaired the engine whose failure caused the crash, and from the dismissal on motion for summary judgment of their complaint against General Dynamics, the manufacturer of the aircraft.

## I. STATEMENT OF THE CASE

These 14 personal injury complaints arose from the death of the crew and all but one of the passengers in a U.S. Navy C–131F transport plane on April 30, 1983, while attempting to make an emergency landing at the Naval Air Station in Jacksonville, Florida, following a fire in the left engine of the plane. Plaintiffs' actions against Aviall were based on the contention that its predecessor, Cooper Air Motive, had negligently installed used or otherwise

unauthorized piston pin assemblies in the aircraft's left engine during an overhaul in 1976. The piston pin in No. 8 cylinder of the left engine of the plane failed shortly after takeoff, resulting in an in-flight fire which caused the left wing to fall and the plane to crash.

The complaint against General Dynamics is that General Dynamics had manufactured the aircraft in question and was liable for negligence and breach of implied warranty as well as strict liability for the alleged deficiencies of the aircraft.

General Dynamics filed its motion for summary judgment, based on the Florida statute of repose, § 95.031(2) Fla.Stat. (1985), since the aircraft had been delivered to the U.S. Navy in 1955 and the statute of repose barred any actions for product liability after a period of 12 years. The trial court granted the motion and dismissed the complaint against General Dynamics.

Thereafter, the case went to trial against Aviall and the jury returned a verdict in favor of the defendant. The plaintiffs then filed their motion for judgment n.o.v. or in the alternative, for a new trial. This motion was denied. This appeal resulted.

## II. STATEMENT OF FACTS

In their effort to demonstrate that the fire causing the accident resulted from the insertion by Aviall of a used piston pin assembly instead of installing a new piston pin assembly during the left engine's overhaul, plaintiffs introduced circumstantial evidence sufficient to have permitted the jury to find in favor of plaintiffs. However, the defendants introduced a substantial amount of evidence, seeking to rebut any inference which the jury could have made from plaintiffs' evidence. No argument is made here that any of the evidence introduced by the defendants was admitted erroneously by the trial court, nor do the plaintiffs make any contention that any charge of the trial court was given in error. The only issue is whether there was sufficient evidence introduced at trial to support the finding of the jury.

Essentially, this evidence consisted of the following:

### A. *Plaintiffs' Evidence*

■ It was undisputed that the fire was caused by the fracturing of the piston pin assembly in cylinder No. 8 of the left engine, a rotary motor containing 18 cylinders. Only a very few pieces of the piston pin assembly from cylinder No. 8 were recovered. However, all of the piston pin assemblies of the remaining 17 cylinders were recovered. A piston pin assembly may be described as follows: the assembly consists of three components which, together are designated as P/N 202445. One component is a hollow steel cylinder just short of six inches in length and not quite one inch in diameter, which is designated P/N 19165, and two aluminum plugs, which are forced into the ends of the pin. They are designated P/N 202444. When the two plugs are inserted in the pin, the result is a complete P/N 202445 piston pin assembly.

The manner in which the piston pin assembly operates was described as follows. Each cylinder has a piston which is, in turn, attached either to a link rod or a master rod by a piston pin assembly. The cylinders, pistons and piston pin assemblies are numbered in accordance with their respective locations within the engine. On one row, the cylinders carry even numbered designations, and in the other row, odd numbered designations. In each row of cylinders there are eight link rods and one master rod. The master rods are located in cylinder No. 8 in one row of cylinders and cylinder No. 9 in the other. The rods transmit the energy from the combustion in the cylinders to the crankshaft.

The failure of the No. 8 piston pin unleashed the master rod, which tore open the No. 8 cylinder and then the two adjacent cylinders, Nos. 6 and 10. Oil spilled out, which ignited and resulted in an intense in-flight fire. The master rod also crimped the oil feathering line which interfered with the feathering of the No. 1 propeller which might delay the crews' discharging the fire extinguisher bottles. The intensity of the fire here caused the wing to separate from the fuselage which, of course, caused the aircraft to crash.

Plaintiffs' metallurgical expert expressed the opinion that the fragments of the failed piston pin established that it failed in fatigue. There was evidence introduced by the plaintiffs that fatigue could result from "long time" use, that is, use for a longer number of flight hours than the number of hours it is intended or designed to serve. There was also proof that at the time of overhaul, all of the pin assemblies had been in service for a number of hours of use that approached the maximum deemed appropriate for such pin assemblies.

The plaintiffs' evidence was to the effect that the defendant used only piston pin assemblies that were marked with the proper logo of Aircraft Certified Engineering, Inc. (hereinafter A.C.E.), which supplied the pin assemblies to Aviall, and there was opinion evidence from two metallurgists that the No. 8 pin could not have been new when installed in the left engine by defendant in 1976.

The plaintiffs' witness, Smith, the son of the owner of A.C.E., testified that the 17 piston pin assemblies that were recovered had not been manufactured by A.C.E. He based this testimony partially on the manner in which the pin assemblies were marked; he testified that they had been manually vibropeened, and that this was contrary to the method by which the pin assemblies were marked by Jackson Bar Products, the company that supplied the parts to A.C.E. He testified that Jackson Bar utilized the roll stamp method to mark the pins; that these markings resembled typewriting.

The plaintiffs' evidence also included the fact that piston pin assemblies had, on some occasions, been inspected, cleaned and reused by Aviall in engines for use in civilian planes, which engines were of the same characteristics as the Navy C–131F involved here, and that such activities were carried on by some of the same personnel who were engaged in overhauling the military engines.

It is helpful at this point to quote appellant's brief with respect to its contention that a used piston pin assembly was installed at the overhaul instead of a new assembly:

Defendant produced a portion of its internal work instructions for D.P.I. which permitted the pooling of complete *pistons and piston pins,* [emphasis in original] and dispensed with the requirement for identifying the source engine by tag.

This instruction, which was specifically applicable to R–2800 military engines, was dated June 7, 1976, seven days before the subject engine was inducted into overhaul.

This work instruction is in direct variance with the contractual requirements and defendant's assertions that the old pins were discarded and scrapped.

Defendant tried lamely to explain it away.

On the military R–2800 engines, cylinder stud assemblies were either reworked or replaced. However, pistons, piston rings and piston pin assemblies were 100% replacement items. The defendant claimed that for each group of 18 cylinders, 18 new pistons with new piston rings and pins marked consecutively 1 through 18, were assembled, placed in a box and sent to final assembly for installation in the correct cylinder of the appropriate engine.

Defendant claimed that the piston pins utilized were taken from the bench stock in the cylinder shop, which in turn was supplied by requisitions drawn on the parts warehouse. The warehouse, in turn, only received piston pin assemblies from Kelly Air Force Base. However, documentation on this was sparse, and there was some evidence that the piston pin assemblies were in short supply at defendant's facility. Defendant's employees denied any recollection of this. No explanation was forthcoming of what was done with the "pooled" piston pin assemblies. *It would seem fair to infer that at some point they got into bench stock.*

During the same time, defendant was also overhauling the R–4360 engine, engines for civilian customers, as well as individual cylinder assemblies.

The military and civilian versions of the R–2800, as well as the R–4360, utilized the same piston pin assembly.

The work was performed on the same assembly line at the same time by the same people in the same facility.

Piston pins for R–2800 engines were inserted in the pistons by the cylinder shop personnel, and in the pistons of the R–4360 engines by the final assembly shop personnel.

Installation of R–2800 pistons and piston pins into cylinders and cylinders into engines was done in the final assembly shop.

For many years, the P/N 202445 piston pin assembly had been an "on condition" part. This meant that at overhaul, the part was removed from the engine, cleaned, inspected and if it passed certain criteria was reused.

Piston pins in the *civilian* engines defendant was overhauling were still "on condition parts" in 1976. Thus, these piston pin assemblies were removed from the engine, deplugged, cleaned, magnafluxed, and, if satisfactory, replugged, reinstalled and reused.

Defendant had a supply of blank plugs on hand for this purpose. Defendant also had vibropeen tools located throughout the plant, which were used to mark engine parts.

(Record references omitted) (emphasis added.)

### B. *Defendant's Evidence*

Defendant relied on the testimony of its metallurgist and of five other witnesses who had been present at the Aviall plant at the time of the overhaul. The metallurgist's testimony as to the cause of the fragmentation of the pin was that the failure originated as a longitudinal crack which the witness testified could have resulted from faulty manufacture, or operational overstress on the part. The expert testified that such overstress included "hydraulic lock" an occurrence where a cylinder is temporarily locked due to oil or fuel conditions, producing a heavy load on the piston pin, or "detonation," where improper manipulation of the flight controls may

cause premature and destructive combustion in the cylinder. There was testimony that these overstresses could cause a fatigue failure even in a new or "low time" pin and that such an occurrence might not even be made apparent to the pilot. There was also testimony that the longitudinal crack could have originated in an inherent manufacturing defect known as a "linear inclusion" or a "longitudinal stringer."

To meet the plaintiffs' testimony from which a jury might infer that the old pin which had been removed from cylinder No. 8 was reused after the overhaul, defendants produced testimony that whenever the company removed a piston pin assembly, it threw the parts into a 55 gallon drum and sprayed them with red paint so that they could not be used again. There was also testimony that the work on the civilian engines was performed beyond a fence in the same area, and that the fence had a gate which remained locked to separate the two work places. There was also testimony that the parts were never exchanged between the two classes of military and civilian workplaces.

The assistant plant manager of the subassembly in the cylinder shop, in which the assembly was put together, testified that all of the parts were supplied by the government and that Aviall never used anything "except government supplied authorized piston pin assemblies." He also testified that there was never a shortage in the parts. He had never "heard of anybody at the plant who was reusing used piston pin assemblies in military R–2800 engines." He testified that the old piston pin assemblies were taken out of the military engines, "thrown into a 55 gallon drum and either sprayed with red paint as a *scrapped* item." ... "Usually they put salt or some other acid on them to make them corrode to where they wouldn't be usable again."

Tom Spencer, who was in charge of inspecting government parts as they were delivered to Aviall, testified that there was "a separation in the plant there between civilian parts and military parts, by a wire fence with a gate and lock. Those parts

were never exchanged or interchanged." He also testified that he had never received "piston pin assemblies for the military R–2800 engines from any source except the military." He testified further that all of the parts he received for such engines were "new and authorized piston pin assemblies." Finally, he stated that he never knew of or saw "anybody using used or unauthorized piston pin assemblies in military R–2800 engines."

Reuben Trevino, who is employed by the United States government as an inspector of the overhaul facility, testified also that he was not aware of any shortage of piston pin assemblies and that the piston pin assemblies which Aviall installed in the engines "were newly manufactured pins." He never saw or heard of anyone at Aviall using improper or unauthorized piston pin assemblies. He supported the testimony of Spencer that civilian and government parts were never commingled.

Mr. Rojillo Rolando Hinojosa, who was the quality control supervisor for the cylinder shop, where the assemblies were completed, also testified that he was not aware of any shortage of piston pin assemblies and he was never aware of the use of used or unauthorized piston pin assemblies in any such engines. He concluded by looking at the paperwork for the No. 8 cylinder that new piston pin assemblies were used in that engine.[1]

Defendant's expert testified that he had measured the 17 available pins of the left engine which had been in use 439.3 hours and that on average the wear on these pins appeared to be less than on the pins in the right engine, which had been used for something over 2,000 hours in flight. From this, he expressed the opinion that the 17 pins in the left engine were "low time" pins and that they were new when they were installed.

Defendant also presented evidence which it contended would have permitted the jury to find that the loss of the plane was due to

an intervening negligent act. This proof was in the nature of a showing that the fire control system built into the aircraft was inadequate because it activated the fire extinguishers and closed a necessary vent door with a hose which was vulnerable to fire damage. It is not necessary for us to consider this additional ground which appellee contends the jury could have found established a lack of causation of the loss of the aircraft.

## III. STANDARD OF REVIEW

A. In reviewing the motion for j.n.o.v., this Court is bound by the decision of the Court of Appeals for the Fifth Circuit in *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir.1969).[2] There, the Court said:

> On motions for directed verdict and for judgment notwithstanding the verdict the court should consider all of the evidence—not just that evidence which supports the non-movers case—but *in the light and with all reasonable inferences most favorable to the party opposed to the motion.* If the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. The motion directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the court, to weigh con-

---

1. The defendant concedes in its brief that the paperwork for the No. 8 cylinder would not, in and of itself, establish the fact that this was a new piston pin assembly.

2. In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this Court adopted as precedent all of the decisions of the former Fifth Circuit decided prior to October 1, 1981.

flicting evidence and inferences and determine the credibility of witnesses.
411 F.2d at 375.

B. The issue resulting from the denial by the trial court of the plaintiffs' motion for new trial requires us to determine whether such denial was an abuse of the discretion of the trial court.

C. The issue respecting the dismissal of the plaintiffs' complaint against General Dynamics, based on the decision of the trial court that the complaint was barred by the Florida statute of repose, is reviewable by this Court as a question of law by determining what is the Florida law on the subject.

## IV. DISCUSSION

A. The appellants' case was dependent upon their proof that when the defendant Aviall overhauled the 18 cylinder engine, someone in the cylinder shop inserted a used piston pin in the piston pin assembly which was later installed in the No. 8 cylinder. They attempt to establish this fact by proving the circumstances surrounding the overhaul to the extent that this was possible by an examination of the piston pin assemblies from the 17 cylinders which were available after the accident. No witness either for the plaintiffs or for the defendant was able to state by direct evidence that when this assembly was put together in the cylinder shop, the person handling the parts actually used a new or a used pin. Among the circumstances upon which the plaintiffs relied was some evidence that there was a supply of pins in what was known as the "bench stock." While there was evidence by the defense that this bench stock was supplied solely by requisitions drawn from the parts warehouse and that the warehouse received piston pin assemblies only from Kelly Air Force Base, a military installation, appellants sought to show that on occasion, piston pin assemblies were in short supply at defendant's facility. In their brief appel-

lants overlooked the requirement that in considering a motion n.o.v. such motion must be considered with all reasonable inferences being considered in favor of the other party. They say: "It would seem fair to infer that at some point they [piston pin assemblies] got into bench stock."

With all of the other circumstantial evidence introduced by the plaintiffs, a jury might infer from such evidence that plaintiffs' contention was correct. However, it is clear that if a jury might make such an inference, it might also draw the opposite inference. We are bound to defer to the jury's finding if it is supported by any inference which supports it. *Boeing, supra.*

While the appellants attack the knowledge and credibility of the five supervisors or inspectors at the plant and of the expert metallurgist offered by the defendant, no motion was made to exclude any of this evidence, and the jury had the benefit of hearing the witnesses and observing their demeanor on the witness stand, and it is their sole duty to "weigh conflicting evidence and inferences and determine the credibility of witnesses." *Boeing v. Shipman, supra,* at 375.

As did the trial court, we conclude that this case is controlled by *Boeing v. Shipman, supra.* Thus, the trial court cannot be faulted for denying the motion for judgment n.o.v.

B. Appellants claim that the trial court abused its discretion in denying the motion for new trial, because they contend that the court denied the motion for new trial on the same basis that it had applied to the denial of the motions for judgment n.o.v. This, of course, would be wrong. However, it does not appear from the trial court's order that it applied the improper standard for the overruling of the motion for new trial.

The entire order of the court dealing with this matter is as follows:[3]

**3.** Separate motions for judgment n.o.v. were filed by plaintiffs Barnett and McConkey. A separate motion was filed by way of a notice on behalf of plaintiffs Spellissy and all of the re-

maining plaintiffs which the trial court considered as a motion for n.o.v. or in the alternative for a new trial.

This cause is before the Court on Plaintiff's, BRENDA McCONKEY, Motion for Judgment N.O.V. or New Trial, filed March 27, 1986, Plaintiff's, LENORA A. BARNETT, Motion for Judgment N.O.V. and in the alternative Motion for New Trial, filed March 28, 1986, and Plaintiff's, SUSAN ALINE SPELLISSY, et al., "Notice of Filing Adoption of Grounds," filed April 3, 1986. Defendant, AVIALL, INC., has filed its opposition in response to these motions.

Reviewing the evidence and all reasonable inferences therefrom in the light most favorable to Defendant, AVIALL, INC., the non-moving party, *see Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir. 1969), the Court concludes that Plaintiffs have not met their heavy burden of showing reasonable men could not reach a contrary verdict than the one for which Plaintiffs pray.

Alternatively, as to Plaintiffs' SPELLISSY, et al., "Notice of Filing Adoption of Grounds," which will be construed as a motion for judgment N.O.V. and motion for new trial, the Court finds that said motion was untimely served. Rules 50(b) and 59(b), *Federal Rules of Civil Procedure.* Accordingly, it is now

ORDERED AND ADJUDGED:

1. That Plaintiff's, McCONKEY, Motion for Judgment N.O.V. or New Trial be and the same is hereby DENIED.

2. That Plaintiff's, BARNETT, Motion for Judgment N.O.V. and in the alternative Motion for New Trial be and the same is hereby DENIED.

3. That Plaintiff's, SPELLISSY, et al., Notice of Filing Adoption of Grounds, which will be construed as a motion for judgment N.O.V. and motion for new trial, be and the same is hereby DENIED.

From the order of disposition of these motions, it is apparent that the contention that the motions for new trial were improperly disposed of can apply only to appellants Barnett and McConkey, since the motion for new trial filed on behalf of the remaining plaintiffs was dismissed on the ground that it had been untimely served

under Rules 50(b) and 59(b), Federal Rules of Civil Procedure.

As to the motions for these two plaintiffs, it is not apparent that the trial court applied the wrong standard to its order denying the motion for new trial. We should not assume that an experienced trial judge intended to apply to the order overruling the motions for new trial the standard which it had set out above for overruling the motions for judgment n.o.v. The order, as issued, cites the appropriate ground for overruling the motions for judgment n.o.v. and then states that the Spellissy group of plaintiffs failed to "obtain timely service," and then states: "Accordingly, it is now ordered and adjudged," without indicating the specific reason for denying the motion for new trial. It did not state that the motions were denied for the same reason as the announced reason for denying the motion for judgment n.o.v.

We therefore conclude that the trial court's order denying the motions for new trial was not based on an improper standard. We also conclude that such a denial was not an abuse of the trial court's discretion.

C. The district court dismissed the complaint of all of the plaintiffs against General Dynamics, Inc., the manufacturer of the plane. The order of dismissal stated:

The Court finds that this cause of action against defendant, GENERAL DYNAMICS, is barred by the Florida Statute of Repose, *Fla.Stat.* § 95.031(2). *See Pullum v. Cincinnati, Inc.,* 458 So.2d 1136 (Fla.Dist.Ct.App. 1 1984), *aff'd* 476 So.2d 657 (Fla.1985); *Hamilton v. Piper Aircraft Corp.,* 473 So.2d 301 (Fla.Dist. Ct.App. 4 1985), *appeal dismissed,* Case No. 67,529 (Fla. January 28, 1986).

Accordingly, it is now:

ORDERED AND ADJUDGED:

That Defendant's, GENERAL DYNAMICS CORPORATION, Motion for Summary Judgment be and the same is hereby GRANTED.

This statute required that a product liability action must be brought "within 12

years after the date of delivery of the completed project to its original purchaser." This statute, which has had a checkered career in the Florida Supreme Court, and which was subsequently repealed by the Florida legislature, has been construed since the decision of the district court, by the Florida Supreme Court in *Nissan Motor Co. Ltd., Petitioner v. Lynn Phlieger, Respondent,* 508 So.2d 713 (Sup.Ct.Fla., 1987). The Florida court concluded that this statute of repose does not apply in an action brought by the personal representatives of a person whose death resulted from the alleged injury. The court held instead that the statutory period prescribed under Florida statutes § 95.11 for an action for wrongful death applies.

It is clear, therefore, that in the case of the 13 plaintiffs herein in the wrongful death actions, the dismissal of the complaints by the trial court must be reversed. With respect to the plaintiff, Melissa V. Kelly, the sole survivor who sued in her own action, the Florida Supreme Court's opinion in *Nissan* gives us no guidance as to the law of Florida, touching on the applicability of the statute of repose.

We therefore direct that the *Kelly* case be withdrawn from the consolidated cases, and as to her case, this Court will pose a certified question to the Supreme Court of Florida, seeking guidance as to whether the *Kelly* case is barred by the statute of repose.

## V. CONCLUSION

We therefore AFFIRM the judgment of the trial court in denying the motions for judgment n.o.v. and denying the motions for new trial. We REVERSE the judgment of the trial court in dismissing the complaints of all of the plaintiffs except Ms. Kelly on motion for summary judgment based upon the trial court's understanding of the Florida statute of repose.

A certification of the remaining issue of the *Kelly* complaint will be issued separately.